[No. 309. Decided January 12, 1892.]

W. L. PENCIL, *Respondent*, v. THE HOME INSURANCE COMPANY, *Appellant*.

APPEAL—HARMLESS ERROR—INSURANCE—PLEADING—CONDITIONS OF POL-
ICY—APPORTIONMENT—OWNERSHIP OF PROPERTY—FORFEITURE FOR
FRAUD—EVIDENCE—INTERROGATORIES TO JURIES.

In an action upon a conditional policy of fire insurance, which is declared upon in the complaint as an unconditional one, there is no reversible error, where the evidence shows the fire not to have been of the excepted classes, and the statute as to variances was not complied with.

Where a policy of insurance was for certain amounts upon a stock of goods, a safe and store fixtures, a complaint, in an action thereon which alleges the loss of the "whole of said stock and fixtures," is sufficient to admit proof of the loss of the safe as included within the term "fixtures," the formal proof of loss having shown that claim was made for the safe.

Although a policy of insurance may contain a clause providing that arbitration shall be resorted to when the parties cannot agree

upon the amount of loss, and that suit shall not be commenced until after an award obtained in the manner stipulated, the assured is excused from applying for arbitration where the insurer declines to pay on the ground that he set fire to the property insured.

Where property insured in different sums in more than one company is destroyed by fire, there can be no apportionment between the companies except where the actual loss is less than the total insurance.

A tentative proposal of partnership by a certain party, to take effect at some future time, and the acceptance of that proposal by plaintiff, does not constitute a partnership, and, under such circumstances, it was proper for the court to refuse to give a charge concerning the ownership of the property insured to the effect that, unless according to the terms of the policy plaintiff was the sole owner, the policy was void.

An attempt by the assured, by the use of money, to induce parties to suppress statements they were threatening to make to the effect that he set fire to his property, such statement not being true in fact, is not such a fraud as will work a forfeiture of an insurance policy, under a clause providing that "any fraud, or attempt at fraud, or any false swearing on the part of the assured, shall cause a forfeiture of all claim under this policy."

The testimony of a physician that he had treated plaintiff for a disease that would tend to enfeeble the intellect and weaken the will power of the sufferer is relevant, for the purpose of showing that it might have been easier to obtain the money and note from plaintiff, under threats of interference with his receiving his insurance money, than from an ordinary man.

The submission of special interrogatories to juries, under § 242, Code 1881, is a matter entirely in the hands of the trial court, and its refusal to submit cannot be treated as error.

*Appeal from Superior Court King County.*

The facts in this case are stated in the opinion.

*Hughes & Hastings,* for appellant.

*James Hamilton Lewis,* and *Boyd J. Tallman,* for respondent.

The opinion of the court was delivered by

Stiles, J.—The third paragraph of the complaint alleged the issuance of the policy, by the appellant, and gave its

date, number, amount, property insured, time, and premium paid; and the seventh alleged performance of all the conditions contained therein by the respondent. The first error assigned is the admission of the policy in evidence at the trial "because the plaintiff declares upon an unconditional policy of insurance, while the policy offered in evidence is a conditional one." The case here is precisely like that of *Clark v. Phœnix Ins. Co.*, 36 Cal. 168, and the offer of the policy was held there to be a variance; but our code, §§ 105-6-7 (1881), provides what shall be done in such instances, and as nothing of the kind was done, and the evidence showed the fire not to have been of the excepted classes, we find no reversible error.

The policy covered "one hundred and thirty-five dollars on his Nerbin safe," and "thirty-five dollars on his store fixtures," besides insurance on stock, and the complaint alleged the loss of the "whole of said stock and *fixtures*." It is insisted that there could be no recovery for the safe because its loss was not specially pleaded. At the trial objection was made to the testimony of Pencil that the safe was worth $35, which the court overruled. We think it clear, taking the complaint altogether, that the safe and store fixtures were intended to be covered by the word "fixtures" used in the allegation of loss quoted above; and there was evidently no surprise to the company in that construction, since the proof of loss submitted to it immediately after the fire made known the claim that the safe had been destroyed.

The policy contained an arbitration clause whereby it was provided that no suit should be commenced until after an award obtained in the manner stipulated, and it was submitted by the appellant without argument that it should have had a charge to the jury, as requested, upon that subject. But we do not consider that this case demanded a charge upon that point. Under the policy, arbitration was

to be resorted to only when the parties could not agree upon the amount of loss. Here, however, within a few hours after the loss, the company assumed an attitude of hostility toward Pencil, from which it has never desisted, by asserting that he set out the fire which burned the property insured, and declining to pay anything on that ground. In the face of such a position it could hardly be expected that the insured would be required to demand an arbitration, and it is very certain that the company never called for one.

This policy contained an express written stipulation that there might be other insurance to the amount of $1,840, and a printed condition as follows:

"In no case shall the claim be for a greater sum than the actual damage to or cash value of the property at the time of the fire, nor shall the assured be entitled to recover of this company any greater proportion of the loss or damage than the amount hereby insured bears to the whole sum insured on said property, whether such other insurance be by specific or by general or floating policies."

The policy was itself specific, the insuring clause covering "$400 on his stock of boots and shoes; $1,440 on his stock of general merchandise, not including boots and shoes; $135 on his Nerbin safe; $35 on his store fixtures." Now, it appeared that subsequent to the issuance of the policy of the appellant the respondent obtained from another company a second policy of $400 on his stock of general merchandise, not including his stock of boots and shoes, so that he had in all $2,140 insurance on that class of goods. Under this state of the evidence appellant asked the court to charge that, if the jury found for the plaintiff, the verdict should in no event be for an amount in excess of the proportion of the total damages which the sum insured under the policy in suit bore to the total amount of insurance on the property. A precisely similar clause in a

policy was construed in *Hibernia Ins. Co. v. Starr*, Tex. May 9, 1890, 13 S. W. Rep. 1017, and it was there held error to refuse an instruction of the kind here requested, and, as we think, with good reason. But in this case the instruction as requested was not applicable, for the reason that the apportionment, if any, must have been between the two policies for $1,440 and $400, respectively, on the general merchandise; and it was faulty in that it did not have coupled with it a direction to the jury that, unless they found the whole value of the general merchandise destroyed to have been less than $1,840, there was no apportionment to be made. The object of such clauses is to restrict the recovery of the assured to his actual loss, and to require of each insurer the payment of only its proportion of the actual loss in case the total loss is less than the total insurance. Obviously, then, if in this case the value of the general merchandise was greater than $1,840, there could be no apportionment. Had a proper charge, as above outlined, been proposed, it would have been error for the court not to have given it, though we doubt very much whether, under the evidence and the general finding of the jury, it would have been of any avail to the appellant.

The next point made is upon the refusal of the court to give a charge concerning the ownership of the property at the time it was insured, to the effect that unless, according to the terms of the policy, Pencil was the sole owner, the policy was void. The fact appeared from the evidence to be, that Pencil was doing business in a building owned by one Cooper, who himself had a few goods in the store. Cooper, about the time Pencil commenced business, proposed that he become a partner with Pencil, putting in the use of his building and certain money he expected to receive, and the goods he had, as his part of the capital. Cooper was postmaster at West Seattle, and kept the post office in the same building. Pencil assented to the pro-

posal of Cooper, with the evident idea, however, that the arrangement should not take effect until Cooper received his expected money. This state of expectancy ran along for several months, until Cooper finally gave up the project, because he was convinced that he could not get the necessary money. In the meantime, some things were done which would have been done had they been partners, Cooper assisting in making sales and drawing some money. But all the time Pencil clearly bought goods and managed the business as his own, and when Cooper dropped the idea of becoming a partner, there was no valuation of the stock and settlement of accounts, but Pencil bought such of Cooper's goods as remained unsold, and there the matter between them ended. The policy of insurance was issued while Cooper was still a prospective partner, and the appellant claimed that it should be allowed to go to the jury upon the proposition that Pencil and Cooper were partners, and therefore the sole property in the goods was not in the former. It is the rule that, where a party presents a case upon a certain theory, and produces even slight evidence in support of that theory, he is entitled to have the jury properly charged upon it. But in this instance, although we have carefully read every word of the voluminous testimony on that point, we find nothing more than the mere tentative proposal on Cooper's part to become a partner at some indefinite future day, and the acceptance of that proposal, and no other, on Pencil's part, so that no share in the title of any of his goods ever left the latter; and from the evidence, it would appear very likely that the company's agent knew exactly how this matter stood, both before and after the policy was issued. Therefore, the request was properly refused.

We now come to consider the main error complained of. As was before stated, the appellant, very soon after the fire, accused Pencil of being the author of his own destruction,

by himself setting fire to the building containing his property. He was, in fact, arrested on the charge of arson, and had two trials therefor, upon the last of which he was acquitted. In this case the defense of arson was interposed, but the jury found against it. Upon that branch of the case, aside from the conduct of the respondent at and before the time of the fire, there was but little testimony, excepting that connected with a transaction which occurred in Seattle the second day after. Within a few feet of Cooper's building was another building, uninsured, owned by one Stewart, and occupied as a liquor saloon, whose barkeeper, Orenshaw, carried on the business there. This building was burned, it catching fire from Cooper's building. Orenshaw testified that very early on the morning of the second day after the fire, Pencil came to him and asked him what he would take to say nothing about the burning of the building. Orenshaw said he had lost nothing, and would take nothing. Pencil then asked what Stewart's loss was, and if he would take five hundred dollars; to which Orenshaw replied that he didn't know anything about it, and Pencil had better go over to Seattle and see Stewart. Upon this both went over to Stewart's place of business and held a conference with him, Pencil taking with him a box out of his safe, and twenty-five dollars in money. Pencil's testimony on this point consisted of a denial of the substance of Orenshaw's statement, and an account of what he claimed to have been the conversation with him. He declared that on the 14th of April he had been threatened with arrest by one Nelson, a detective, on the charge of arson, based upon evidence to be furnished by Orenshaw, and that on the morning of the 15th he saw Orenshaw and asked him "what these threats meant." Whereupon Orenshaw said that Stewart had lost fifteen hundred dollars; that he wanted something out of it; and that for five hundred dollars he would say nothing about it. Pencil under-

stood him to mean that, unless Stewart was paid that
much, they would attempt to prevent his getting his insur-
ance; and Orenshaw told him they would have him ar-
rested unless he paid it.  Being quite old and sick, and
having lost everything he had in the fire, he claimed to
have yielded to this demand, to save himself, although
knowing he had done nothing that could be proven as
evidence of a crime.  He had no money other than the
twenty-five dollars, but at the interview between himself,
Stewart and Orenshaw he gave it to Stewart, and also a
document in these words:

"SEATTLE, April 15, 1890.

"For value received, I promise to pay Murdock Stewart
the sum of four hundred and seventy-five dollars, imme-
diately on settlement and payment of the insurance com-
pany my claim.        W. L. PENCIL."

The testimony of Stewart and Orenshaw was, that they
took the money and note solely for the purpose of using
them as evidence in an expected criminal prosecution of
Pencil, and the evidence upon this subject covered a
large range which it is not necessary to review.  The
theory of the defense was, that this transaction was an
attempt by Pencil to close the mouth of Orenshaw as to
any facts which he might be able to testify to concerning
Pencil's suspicious actions a few hours before the fire, and
which, if known to the insurance company, might make
it hesitate or decline to pay his loss.  On the other side
the whole thing was denounced as a conspiracy on the
part of Nelson, Stewart and Orenshaw to get what money
Pencil had by frightening a weak, half-sick old man into
believing that they held him in their power, and to earn
a reward of five hundred dollars offered by the insurance
union for the arrest and conviction of incendiaries.  In
this condition of the case the court charged the jury thus:

"If you find by a fair preponderance of the testimony
herein that plaintiff attempted to induce the said Orenshaw

and Stewart, or either of them, not to give any testimony or make known any facts to the defendant which would show or tend to show that plaintiff had set out or caused to be set out the fire which burned the property described in the said policy of insurance sued on herein; or if you find that plaintiff paid or offered to pay the said parties, or either of them, any sum of money as an inducement to them to suppress such information or testimony (and that such testimony or information was true), then you should find that the plaintiff has been guilty of such fraud as will vitiate the said policy of insurance and prevent his right to recover thereon; and in event you so find, your verdict should be for the defendant."

This charge was given at the request of the appellant, except that the line in parentheses was injected by the court, and error is alleged upon the modification thus made. Without the modification, the instruction would have been that any attempt of Pencil to induce Stewart or Orenshaw by words or money not to state what he knew to be absolutely false, and knew to be so known by them, would render his policy void under that clause which read—

"Any fraud or attempt at fraud, or any false swearing on the part of the assured, shall cause a forfeiture of all claim under this policy."

As modified it meant that the suppressed statement must be a true statement. Stewart and Orenshaw both testified freely and fully at the trial. The former knew nothing about the matter except what transpired in connection with the note; and the latter nothing but that and the fact that he saw Pencil pass the front of his saloon at about eleven o'clock at night, some three hours before the fire broke out. Cooper and Pencil both testified that Pencil was in his bed in a room over the store at that hour, and until he was awakened by the alarm of fire from without.

It is beyond question that, aside from the terms of insurance contracts, public policy requires that every person whose property which has been covered by insurance is de-

stroyed, shall be frank, open and honest with the insurer, or lose all benefit of his contract. It is hardly necessary to allude to authorities. They have been cited to us in numbers and of great strength. But neither side has furnished us with a precedent which is even nearly like this case, and we are constrained to view it as not within the general rules. Here, as was before said, the theory of one side was arson, and an attempt to cover the crime, and the effort to cover it by the subornation of witnesses; and that of the other was blackmail and perjury. The issue was so strongly presented, and the certainty was so absolute, that if the jury believed the one it must find if not the arson, at least the truth of the inculpatory statements, and crediting the other it must find conspiracy and foul wrong, that it seems impossible that justice could have been reached by any other course than that taken by the court. If this old man, as the jury must have found, was surprised and frightened into doing what he did to avoid penury, although he knew there was no ground for charging him with burning his property, then he was under a duress that should excuse him, as it has many a man for a far greater offense. True, his contract in that respect must be enforced, but his contract does not make that a fraud which is not a voluntary act. We must say that no business man in his senses would submit to such robbery. If he were innocent he would flout the blackmailer, and dare him to do his worst. But that depends much upon how men are constituted. Many a one has done a foolish thing which has involved him in volumes of explanation; but when he has sufficiently explained we relieve him. We think it would have been error in this case, therefore, to have closed the door to any proof that the money and note were procured from Pencil by fraudulent practices, as would have been the effect of giving the charge asked without the qualification inserted.

Kindred to the subject last discussed was appellant's objection to the testimony of a physician, to the effect that soon after Pencil was arrested, and during the time he was in jail, the former had treated him for cerebral hyperæmia, or over-supply of blood in the brain, and insomnia, which the doctor deposed would tend to enfeeble the intellect and weaken the will power of the sufferer therefrom. Pencil claimed to have been in the same condition, with his distress over the loss he had sustained, and the suspicions that seemed to have been aroused against him, when he had the transaction with Stewart and Orenshaw. This inquiry, it seems to us, was not erroneous, under the circumstances. It was not sought to establish the insanity of Pencil, nor to set up for him a different standard of legal or moral obligation from that which controls ordinary men, but to show from the facts touching his physical and mental condition that it might have been easier to obtain from him the money and note, under threats of interference with his receiving his insurance money, than from an ordinary man. The main question was whether Pencil was to be believed in his statement concerning the transaction, and the physician's testimony was pertinent, as tending to place him on a plane lower than the ordinary, where the influence of fear and dread of arrest might overcome his calmer and better sense.

While the practice of submitting special interrogatories to juries under Code, § 242, would, perhaps, in many cases, conduce to a more correct administration of justice, the statute leaves the matter entirely in the hands of the trial court, and there was, therefore, no error in the refusal to submit in this case.

Appellant argues upon two other instructions which are said to have been given at the request of respondent. But there is nothing in the exceptions to identify them. There are eight exceptions of this kind, but the charge of the

court is not numbered, nor is there anything to indicate at whose request any part of it was given, and the exceptions are merely "to the —th paragraph of instructions, given at the request of plaintiff."

Upon all points, therefore, the judgment is affirmed.

ANDERS, C. J., and DUNBAR and SCOTT, JJ., concur.

HOYT, J., did not sit, being disqualified.